**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-00051 (TNM)** |
| **v.** | : | |
| | : | |
| **REVA VINCENT,** | : | |
| | : | |
| **Defendant** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Reva Vincent to 30 days of incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

## I.     Introduction

Defendant Reva Vincent, age 57 years, participated in the January 6, 2021, attack on the United States Capitol — a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars in losses.[1]

Defendant Vincent pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence that includes 30 days of incarceration, 36 months' probation, 60 hours

---

[1] Although the Statement of Offense in this matter, filed on April 22, 2022 (ECF No. 10 at ¶ 6) reflects a sum of more than $1.4 million dollars for repairs, as of April 5, 2022, the current estimate of the losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

of community service, and $500 in restitution is appropriate in this case because Vincent; (1) posted statements on social media before January 6 stating her intentions to, *e.g.*, "remove congress period" on that day and encouraging others to join her; (2) was aware of violent activity taking place around the Capitol before entering the building on January 6; (3) while still outside the Capitol on January 6, energetically encouraged others to go inside the Capitol; (4) recorded photographs and videos on her mobile telephone of her actions on January 6 but later deleted them; (5) while inside the Capitol, joined in chants of "our house" and other slogans that encouraged the rioters to continue their assault on the Capitol; (6) posted false statements on social media about what happened during the riot; and (7) initially minimized her actions in entering the Capitol to FBI agents.

On the afternoon of January 6, 2021, Vincent made her way from her hotel, which was West of the Capitol, around to the East side of the Capitol, through the gathering crowd in the restricted area and climbed to the top of the stairs outside the Rotunda Doors. There, Vincent watched as the Rotunda doors opened and closed several times as members of the crowd tried to get inside the Capitol and officers tried to keep the doors closed. When the doors opened, Vincent shouted encouragingly at others near the door, "Go, go, go!"[2] In addition, Vincent shouted, "That's our house. Leave our house." "We want our house!" "Stop the Steal!" Defendant saw people affected by pepper spray and heard others yell as they were leaving the Capitol through the Rotunda doors, "We stopped the vote!" Vincent moved from the pillar towards the Rotunda door and waited for her opportunity to enter.

---

[2] Videos taken by Vincent containing statements made by Vincent will be provided to the Court in advance of the sentencing hearing.



(Still photograph from video taken by Vincent outside Rotunda doors)

At approximately 3:01 p.m., Vincent filmed her entry into the U.S. Capitol past two police officers and shouted excitedly, "In the door, we're in the door!  This is our house, people! This is our house, not their house." "We are inside, people!" "We made it inside!" The audio of her entrance into the Capitol sharply contradicts Vincent's initial statement to FBI agents as to her intent and how she got into the Capitol. In her interview, Vincent claimed that she was pushed through the door by the crowd and that she was scared. I "[g]ot shoved in there. It scared me real [sic] bad, being crushed so bad." "Next thing I know, I'm in the Rotunda."  1/13/21 Tr. 11.[3] In fact, Vincent's entry into the Capitol was not accidental and her commentary as she filmed the scene belied her interview statement. Vincent's commentary can only be described as jubilant.

---

[3] Selected quotes from a transcript of Vincent's January 13, 2021 interview with agents are attached as Exhibit A.

Vincent yelled, "This was built with our money, our money, not theirs." "We own this Capitol." "They need to go." After entering the Rotunda door, Vincent did not turn around and try to leave. Instead, she busily filmed the scene around her and made her way to the Rotunda.



(Still photograph above shows Vincent (circled in red) filming just after she entered the Capitol through the Rotunda doors.)

The Court must also consider that Vincent's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. *See United States v. Thomas Fee*, 1:21-cr-00131 (JDB), Tr. 04/01/2022 at 17 ("The defendant was an active participant in a mob assault on our core democratic values and our cherished institution. And that assault was intended by many and by the mob at large in general to interfere with an important democratic processes of this country. I cannot ignore that, cannot pull this misdemeanor out of that context.") (statement of Judge Bates). The defendant's actions and those of his fellow rioters enabled the breach of the Capitol, threatened the lives of the police

4

officers, legislators and their staffs, and disrupted the certification vote for several hours. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). Here, the facts of and circumstances of Vincent's crime support a sentence which includes 30 days of incarceration and 36 months of probation.

## II.    Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 10 (Statement of Offense), at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions — from the most mundane to the most violent — contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Vincent's conduct and behavior on January 6th.

### *Defendant Vincent's Role in the January 6, 2021 Attack on the Capitol*

According to evidence obtained from Facebook, prior to January 6, 2022, Vincent posted a number of messages suggest the possibility of violence, including one dated December 1, 2020, "A LAST WARNING TO THE LEFT IN AMERICA Dear Leftist/Progressive, Your [sic] life is in severe danger. That wasn't a threat: It's a fact."[4] Later, in the same post, Vincent wrote, "The real America is tired of being TREAD ON and doesn't have much left to lose besides ammo." On December 17, 2020, in response to a post by another individual, Vincent commented, "This is a traitor and he needs to be dealt with along with 100s in congress[.] [L]et[']s bypass the

---

[4] Copies of Vincent's Facebook posts referenced herein are set forth in attached Exhibit B.

courts and do what needs to be done ... take them ALL out[.]" On December 31, 2020, Vincent

made a plea on social media for people to join her on January 6, 2021.

> How did we get here? Well I know on my part I feel asleep[.] I know that we the people wasn't awake[,] we the people didn't watch and learn what was happening[.] [C]ongress has decided they know what[']s best for us congress decides what we do, where we go, when we work, when we worship, when our kids go to school[,] what they learn and it[']s all out [sic] fault[.] [W]e fell [sic] to be alert we fail to say NO but there is one way to stop this, **WE THE PEOPLE SAY NO MORE and that will be on January 6th 2021[.] [I]f you can go please be there we need all we can get.** Side note I am not going to DC for ME I am going for my GRANDKIDS, GREAT GRANDKIDS, and all others that come after me if we don't STAND and yes this is the last one they will live in a much worse country[.] WE MUST STAND NOW. (Emphasis and punctuation added).

In another post on December 31, 2020, Vincent further discussed her intentions, "Just so u [sic]

know the 6th won't be a protest or rally it[']s to remove congress period [.] [W]e there till they

leave[.] [I]t[']s not being announced due to resistance eyes[.] [G]oing to be biblical[.]" In

response to a comment, Vincent wrote, "Oh I will and we aint [sic] leaving till they gone[.]" On

January 1, 2021, Vincent wrote, "No [sic] show up to TAKE BACK OUR HOUSE AND FIRE

CONGRESS." On January 5, 2021, Vincent posted, "Done with those crooks they got to go I be

first in door rest will follow if I am taken out we have a plan."

On or about January 5, 2021, Vincent and her husband drove six other individuals from

Kentucky to Washington, D.C. to protest Congress' certification of the Electoral College. ECF

No. 10, ¶ 8.  On the morning of January 6, 2021, Vincent and her husband attended the "Stop the

Steal" rally at the Ellipse.  *Id*., ¶¶ 9-10. After attending the rally, they went back to their hotel to

rest and have lunch.  *Id*., ¶ 10. In the afternoon, Vincent, her husband, and other protestors

moved to the grounds of the U.S. Capitol.  *Id.* While going around the Capitol building Vincent

could hear flash bangs coming from one side of the Capitol and later saw clouds of tear gas. *Id*.

In her FBI interview, Vincent denied seeing any violence from protestors. Contradicting her earlier posts that her presence in D.C. on January 6 would not be a protest. Vincent also posted, "Uh, if your [sic] in Washington Jan 6th we walk in and make them LEAVE period." Vincent also alleged in her interview that she went into the restricted area outside the Rotunda door because two women on the ground purportedly said that "they're going to hear us. They're letting us in." Vincent claimed that "I was excited, wow, this is great, we're gonna [sic] get heard. So that's what made me go up the steps on to the back part of it. That's the reason I went up there because I thought we were being heard." 1/13/21 Tr. 9.

Vincent used her telephone camera to film the crowd outside the door before 3:00 p.m.[5] ECF No. 10, ¶ 11. As she filmed, Vincent can be heard excitedly yelling at the crowd, "This is our house!" As stated above, Vincent yelled along with the rest of the rioters and encouraged others to go inside, "Go, Go, Go!"  *Id*. Vincent knew at the time she entered the U.S. Capitol that the building was restricted, that she did not have permission to enter the building, and her intent was to impede and disrupt the certification vote by Congress. *Id*. ¶15. At approximately 3:01 p.m., Vincent entered the Capitol through the Rotunda doors and held up her camera above her head to film as she entered. *Id*. ¶12.

---

[5] The initial breach to the Rotunda doors occurred at approximately 2:30 p.m.



(In the above still photograph, Vincent's phone camera and hat are visible in the red circle.)

Vincent then entered the Rotunda itself, where other rioters had gathered. Once inside the Rotunda, Vincent continued to film and make commentary into her phone camera. *Id*.



(Above is a still photograph from video taken by Vincent of her yelling inside the Capitol)

After about a minute or two of filming, a group of police officers entered the Rotunda.  In response to their presence, Vincent jeered, "Uh oh, they're in trouble." "Leave our house, we're done with them." *Id*., ¶13.



(Above is a still photograph from Vincent's video of officers arriving in the Rotunda)

A review of Vincent's Facebook postings during the riot show that Vincent wanted to build a reputation and credibility amongst her followers by posting statements that she knew were untrue. After leaving the U.S. Capitol, Vincent posted on Facebook, "Man they shoot [sic] a women [sic] i [sic] wasn't too far behind her." *Id*. ¶ 14. When a concerned person told Vincent via a post to "Get out of there!!! Go Home!!!!" *Id*. Vincent replied, "[H]ell no thats [sic] our house." *Id*. Vincent later admitted that she was bragging in the above post and had no personal knowledge of the shooting. *Id*.

Similarly, at around 4:00 p.m., after Vincent left the Capitol building, another individual posted a note encouraging Vincent to go back inside the Capitol. In response, Vincent posted,

"[U]nfortunately I was hurt in the first run cant [sic] go back in." When Vincent was asked if she was alright, Vincent replied, "[L]ong story lol but don't be between Patriots and cops [laughing emoji] it hurts." Despite Vincent's post suggesting police were responsible for her allegedly being hurt, there was no evidence that Vincent had any direct contact with any police officers or that she was injured by them. Another individual then told Vincent to go home and to get out of there.  In response, Reva Vincent posted, "i will DIE FOR MY FREEDOM."

Vincent's breach of the Capitol was not an accident. As noted earlier, in a December 2020 post, Vincent stated she planned to go into the U.S. Capitol to disrupt Congress on January 6, 2021. After the riot, Vincent posted that she was proud she made it inside the Capitol. On January 6, 2021, on January 11, 2021, Vincent posted, ". . . I WAS THERE AND DAM PROUD OF IT[.] I will stand for what I believe as most are allowed to but not for long if we don[']t do something to get back what we use to have . . ."

*Vincent's Voluntary Interview with the FBI*

On January 13, 2021, Vincent gave a voluntary interview to the FBI. During the interview, Vincent admitted to traveling to Washington with her husband and driving six other individuals to Washington, D.C. to attend the rally and then to go to the Capitol because she "wanted to hear what the electoral vote results were going to be." 1/13/21 Tr. 8.

Vincent described going to the east side of the Capitol and that the crowd there was massive when she arrived. Vincent described the scene and the chaos. "[W]hen I get into a large group of people like that, voices don't make any sense, it's all mumble-jumble. Of course, lots of screaming, yelling, yays, flags waving." 1/13/21 Tr. 9. "Of course, my wonderful post on Facebook made it look all bad, but I was not there to do anything other than let my voice be heard. That's it." 1/13/21 Tr. 10. Vincent reiterated that she thought Congress was going to hear

from the massive crowd. "Yes, yes, Congress. When we were on the bottom, and they said that, we actually believed we were going to get to go in and them hear us." *Id*.

In her interview, Vincent stated that her entry into the Capitol was accidental. Vincent stated, "I got -- I was in there, and I was seriously crushing -- I don't -- and this is the honest to God's truth, I don't know what happened, but something was going on up front. And all of a sudden, I'm so crushed, I don't -- I can hardly breathe, and I'm freaking out, and I'm screaming, move, move. Next thing I know, there's the door, and I'm in." 1/13/21 Tr. 11. Vincent noted that there were policemen just inside the door "just standing there." 1/13/21 Tr. 13. Vincent denied seeing any violence. "No, I just know that the crowd seemed to be overexcited, but I did not see -- physically see any violence. I did not." 1/13/21 Tr. 15. Vincent claimed she went into the Rotunda, scanned for her husband, but did not see him. After a few minutes, Vincent said she determined that Congress was not going to let them in, "So, I just took it upon myself thinking, well, I guess we can't go in. So, I left." 1/13/21 Tr. 21. Vincent stated, "I went in, and I made a U-ey [sic] out." 1/13/21 Tr. 24.

At the time of the interview, Vincent claimed that she hurt her back by being pushed into Capitol by the crowd. "Because the way the crowd had shoved me in there, it hurt my back. And I needed to get out because -- I mean, I -- they just about squashed me in it." *Id*. Vincent further stated that she thought, "I don't wanna [sic] be here. Just had that yucky feeling and I wanted out." *Id*. After she left the Capitol, Vincent claimed she made the Facebook post about the woman being shot because some man "was just walking by. He said, man, they shot that girl up there, and pointed in front of us. . . toward the Capitol." 1/13/21 Tr. 16-17. Vincent told the agent she regretted making the post, describing her actions as "so stupid." 1/13/21 Tr. 17.

Vincent admitted that she "deleted photos and video . . . Because I had people telling me bad things. So, I thought – it's not that I was trying to hide anything' cause you know I was there." 1/13/21 Tr. 25.

*The Charges and Plea Agreement*

On February 14, 2022, the United States charged Vincent by Criminal Information with one count of parading, demonstrating, or picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). Vincent voluntarily turned herself into law enforcement agents in Kentucky. On April 22, 2022, pursuant to a plea agreement, Vincent pleaded guilty to Count One of the Information, charging her with a violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Vincent agreed to pay $500 in restitution to the Architect of the Capitol.[6]

### III.     Statutory Penalties

Vincent now faces sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Vincent faces up to six months of imprisonment and a fine of up to $5,000. Vincent must also pay restitution under the terms of her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

### IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence,

---

[6] Restitution should actually be made to the Department of the Treasury.

§ 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 30 days of incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 was a crime unparalleled in American history and defies comparison to other violent riots. It represented a grave threat to our democratic norms and practices. Indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants.

While each defendant must be sentenced based on their own conduct, this Court should consider that each person who entered the Capitol on January 6 without authorization did so under extreme circumstances. As they entered the Capitol, they very likely crossed through numerous barriers and barricades and heard the violent outcries of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting between the rioters and police and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while assessing Vincent's individual conduct and fashioning a just sentence, this Court should look to a number of critical aggravating and mitigating factors, including: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) defendant's reaction to acts of violence or destruction; (5) whether, during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from police officers; and (9) whether the

defendant demonstrated  sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment. Had Vincent personally engaged in violence or destruction, she would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of Vincent is therefore not a mitigating factor in misdemeanor cases.

From her hotel, Vincent would have walked past the West side of the Capitol to get to the Rotunda doors on the East side. She would have seen the masses of people, the breach of the barriers, and seen and heard the crowds and the police being overwhelmed. Yet, in her interview, Vincent claimed that she did not see any violence. Once outside the Rotunda doors, Vincent perched near a pillar and observed the chaos before her – she even lost her husband in the crowd. Instead of turning around and going back down the stairs, Vincent pressed forward with the rest of the crowd towards the doors. Vincent saw the Rotunda doors open and close several times and encouraged others in front of her to enter, telling them to "Go, Go, Go!" and exclaiming, "This is our house!"

Despite Vincent's claims in her interview that she was scared and was pushed into the Capitol, the video and audio taken by Vincent show that she was an active participant in the riot. Moreover, according to her pre-riot posts days before January 6, 2021, Vincent had every intention of going to the Capitol to stop Congress from accepting the vote of the Electoral College. "Just so u [sic] know the 6th won't be a protest or rally its [sic] to remove congress period [.]" Her statements while entering the Capitol echo those sentiments, stating, "We own this Capitol." "They need to go."

Vincent's untruthful posts on Facebook during the riot, in which she claimed to be in close proximity to a shooting ("Man they shoot a women i wasn't too far behind her"), and her inference

that she couldn't go back into the Capitol because she was injured by police ("[L]ong story lol but don't be between Patriots and cops [laughing emoji] it hurts") appear to be an attempt to bolster her credibility with other rioters and their supporters. Vincent also destroyed evidence by deleting photos and video of her activities on January 6, 2021.

Although Vincent attempted to minimize her conduct as described above, Vincent has been cooperative with the FBI. She voluntarily interviewed with the FBI about a week after the riot. In that interview, she admitted to entering the U.S. Capitol and described how she wanted to be heard by Congress regarding the vote by the Electoral College. Vincent immediately accepted responsibility for her actions and participation in the riot. Vincent's counsel quickly informed the government that Vincent would accept the plea offer provided by the government. Vincent was only inside the Capitol for approximately 5 minutes – shouting along with others that "[T]his is our house," going into the Rotunda, looking around as rioters and police were gathering, and then going out the same way. Although Vincent has taken responsibility for her actions, it is unclear whether she has expressed any true remorse.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of 30 days of incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

### B.  The History and Characteristics of Vincent

Vincent is a 57 year-old married woman with two adult children. *See* ECF 15 ("Presentence Report" or "PSR") ¶ 37. Defendant obtained her high school diploma. *Id*. ¶ 52. As set forth in the PSR, Vincent has no criminal history. *Id*. ¶¶ 25-31. Vincent does not appear to have a drug or alcohol problem. *Id*. ¶¶ 49-51. Vincent reported that she is self-employed managing four rental properties. *Id*. ¶¶ 53-54. Vincent and her husband own a 3-bedroom farmhouse, outbuildings, and

farmland. *Id*. ¶ 40. In the past, Vincent associated with an extremist group, allowing her property to be used by others to conduct firearm and repelling training. *Id*. The PSR does not suggest that Vincent was mentally and/or emotionally incapable of avoiding her criminal conduct; instead, she chose to engage in criminal conduct. *Id*. ¶¶ 46-48.

Vincent quickly gave agents with the Federal Bureau of Investigative a statement admitting to her presence in the Capitol. Once Vincent entered the Capitol and Rotunda, she became aware of the group of police officers and left within 5 minutes of her entry. Vincent has been compliant with the conditions of pretrial release and has not had any issues. Even though Vincent knew she would be attempting to enter the Capitol, nothing about her dress suggested that she was ready for violence. However, as discussed above, Vincent's rhetoric before and after the riot suggested that she was mentally prepared for violence.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[7] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of

---

[7] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

> But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again.

(Statement of Judge Walton at sentencing hearing), *United States v. Mariposa Castro,* 1:21-cr-00299, Tr. 2/23/2022 at 41-42.

General deterrence is an important consideration because many of the rioters, including Vincent, intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during the sentencing hearing in *United States v. Paul Hodgkins*, 21-cr-188-RDM,

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [[Defendant Last Name]] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters — especially those who intend to improperly influence the democratic process — that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Vincent's lack of criminal record, her acceptance of responsibility and quick surrender to authorities suggest that a long period of incarceration is not necessary to deter Vincent from future criminal activity. However, Vincent's posting about her activities during the riot, deletion of photos and video, and minimization of her intent entering the Capitol when interviewed suggests that some period of incarceration is warranted to press upon Vincent that she and others like her cannot illegally stomp upon a legitimate democratic process and fail to abide by the principals and law that holds this country together.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[8] This Court must sentence Vincent based on her own conduct and relevant characteristics, but should give substantial weight to the context of her unlawful conduct: her participation in the January 6 riot. Although those like Vincent convicted of misdemeanors are generally less culpable than defendants convicted of felonies, misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes. A probationary sentence should not be the default.[9]  *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth at sentencing). Accord, *United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 (statement of Judge Friedman).

---

[8] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[9]  Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

Vincent has pleaded guilty to Count One of the Information, charging her with one count of violating 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. Avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*,

483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against police officers, and large number of victims. Thus, even though many of defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case. The sentences in those cases differed substantially from one another. But that range of sentences illustrates that, for Section 5104 violations were the entire statutory range is only six months, any sentence in that range cannot create an unwarranted disparity.

The Court in *United States v. Frank J. Scavo*, 1:21-CR-254 (RCL) sentenced the defendant to 60 days' incarceration. Scavo entered the Capitol through the Rotunda Doors, where multiple assaults on police occurred, some of which Scavo captured on his cellphone. Despite witnessing violence, Scavo, entered the Capitol. Scavo was only inside of the Capitol for a short period of time, approximately 10 minutes. Scavo was boastful about his participation and once inside the Capitol recorded statements on his cellphone about storming and taking back the Capitol. Scavo also downplayed the violence at the Capitol, and made public statements, including in a television interview, that either downplayed or made light of his conduct. Scavo was cooperative with his investigation and produced to the FBI evidence of his conduct at the

Capitol. He also expressed remorse for his actions. Scavo had no prior convictions at the time of sentencing.

In *United States v. Caleb Jones*, (1-21-CR-321 (JEB)), the government recommended a sentence of 90 days home confinement and Judge Boasberg sentenced Jones to 60 days. Jones was in the Capitol for approximately 15 minutes, took videos while inside, and scaled a wall to gain access to gain access to the building.

In *United States v. Kostolsky*, (1-21-CR-197 (DLF)), Kostolsky scaled a wall to get to the Upper West Terrace after he saw others doing the same, entered the Capitol through the Parliamentarian doors breached by rioters only 30 seconds earlier, remained inside for approximately 10-13 seconds but left after Capitol police yelled "get out."  Kostolsky proudly texted friends that he scaled the wall, got tear gassed, and "caught a rubber bullet." He first denied entering the Capitol when talking to the FBI, but then later admitted he went in. Similar to Vincent, he deleted videos from his telephone. The government recommended 30 days' incarceration and Judge Friedrich sentenced him to 30 days of home confinement.

In *United States v. Michael Stepakoff*, (1-21-CR-96), Judge Contreras sentenced the defendant to 60 days home confinement. The government had recommended 14 days imprisonment. Stepakoff claimed he did not know he couldn't be in the Capitol despite being a lawyer who practiced criminal law for over a decade. He entered the Capitol as others climbed through broken windows around him. He also spread misinformation on social media glorifying the events of January 6, 2021.

In *United States v. John Wilkerson, IV*, (1-21-CR-302 (CRC)), Wilkerson was in the Capitol for approximately 20 to 25 minutes. He had limited social media posts after January 6 indicating a lack of remorse. The government requested a sentence of two months' home

confinement and 36 months' probation. Wilkerson was sentenced to 36 months' probation.

In *United States v. Sizer*, (1-21-CR-621 (CRC)), the government recommended a sentence of two months home confinement and 36 months' probation. Sizer was inside the Capitol for approximately two minutes. She lied to the FBI about going in and she did not have any social media posts or a criminal history. The defendant was sentenced to 12 months' probation and a $5,000 fine.

*In United States v. Kenneth Reda*, 1:21-cr-452 (TFH), defendant sentenced to two months of home detention and three years of probation. Reda expressed his prior intention to storm the House during electoral vote certification; recorded video footage and published it showing his efforts to enter the Rotunda door. Reda stood mere feet away from violent efforts by clear the Rotunda and filmed a video urging rioters on by shouting "Let's go to the House[!]" Reda spent around 10 minutes inside the building.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

V.      **This Court Has Authority To Impose A Split Sentence In This Class B Misdemeanor Case**

As nine judges of this District have now concluded, this Court has the authority under 18 § 3561(a)(3) to impose a "split sentence," *i.e.*, a sentence requiring both a term of imprisonment and a term of probation, on a defendant who has been convicted of a "petty offense." *See, e.g.*, *United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case), *appeal pending*, D.C. Circuit No. 22-3018; ; *United States v. Sarko*, No. 21CR591 (CKK), 2022 WL 1288435, at *1 (D.D.C. Apr. 29, 2022) (explaining why a split sentence is permissible in a petty offense case); *United States v. Caplinger*, No. CR 21-0342 (PLF), 2022 WL 2045373, at *1 (D.D.C. June 7, 2022) ("the Court concludes that a split sentence is permissible for a petty offense and therefore is an option for the Court in Mr. Caplinger's case."); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing split sentence); *United States v. Meteer*, 21-cr-630 (CJN), ECF 37 (D.D.C. April 22, 2022) (imposing split sentence); *United States v. Entrekin*, 21-cr-686 (FYP), ECF 34 (D.D.C. May 6, 2022) (imposing split sentence); *United States v. Revlett*, 21-cr-281 (JEB) ECF 46 (D.D.C. July 7, 2022) (imposing split sentence); *United States v. Getsinger*, 21-cr-607 (EGS), ECF 60 (D.D.C. July 12, 2022) (imposing split sentences); *United States v. Ticas*, 21-cr-00601 (JDB), ECF 40 (D.D.C. July 15, 2022).[10]   This Court should follow suit and sentence Vincent 30 days in custody and 36 months' probation.

---

[10] In *United States v. Lindsey*, 21-cr-162 (BAH), ECF 102, the defendant pleaded guilty to three counts: 18 U.S.C. § 1752(a)(1); 40 U.S.C. §§ 5104(e)(2)(D) and 5104(e)(2)(G). Chief Judge Howell sentenced Lindsey to five months incarceration on each of the § 5104 counts, to be served concurrently, and 36 months' probation on the § 1752(a)(1) count.

If this Court elects to impose a term of intermittent incarceration in this case, it need not decide that question in this case because there is no dispute that a defendant can be required to "remain in the custody of the Bureau of Prisons during nights, weekends, or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release." 18 U.S.C. § 3563(b)(10). Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration imprisonment as a condition of probation in one of two ways. S. Rep. No. 225, 1983 WL 25404, at *98. First, a court can direct that a defendant be confined in "split intervals" over weekends or at night. Id. Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two." Id.

Moreover, this Court could impose an uninterrupted term of up to fourteen days incarceration as a condition of probation. Although the statute does not define an "interval of time," case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time. *See United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, e.g., for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also United States v. Anderson*, 787 F. Supp. 537, 538 (D. Md. 1992) (continuous 60-day incarceration not appropriate as a condition of probation). A 14-day term of imprisonment is therefore permissible under Section 3563(b)(10). *See United States v. Stenz*, 21-cr-456 (BAH) ECF 38 (D.D.C. Feb. 17, 2022) (imposing

imprisonment under Section 3563(b)(10); *United States v. Schornak*, 21-cr-278 (BAH) ECF 71 (D.D.C. Feb. 18. 2022) (same); *United States v. Herendeen*, 21-cr-278 (BAH) ECF 87 (D.D.C. Apr. 1, 2022) (same); *United States v. McCreary*, 21-cr-125 (BAH) ECF 46 (D.D.C. Apr. 1, 2022) (same); *United States v. Reed*, 21-cr-204 (BAH) ECF 178 (D.D.C. Apr. 14, 2022) (same); *United States v. Watrous*, 21-cr-627 (BAH) ECF 40 (D.D.C. Apr. 21, 2022) (same); *United States v. Vuksana*j, 21-cr-620 (BAH) ECF D.D.C. Apr. 29, 2022) ECF 43 (same); *United States v. Heinl*, 21-cr-370 (EGS) ECF 43 (D.D.C. June 8, 2022) ECF 43  (same); *United States v. Cameron*, 22-cr-00017 (TFH) ECF 36 (same).

No court appears to have decided whether a term of continuous imprisonment greater than two weeks but less than 30 days is consistent with Section 3563(b)(10), and the government does not advocate such a sentence here. Practical concerns with multiple short terms of intermittent confinement (i.e., nights and weekends in jail), which would require repeated entries and departures from a detention facility during the COVID-19 pandemic, thereby increasing the risk of spreading contagion in the facility, may militate against imposing this type of "intermittent" confinement.  For that reason, any 14-day term of imprisonment imposed as a condition of probation under Section 3563(b)(10) should be ordered to be served without interruption.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Vincent to 30 days of incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by

imposing restrictions on her liberty as a consequence of her behavior, while recognizing her acceptance of responsibility for her crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     */s/ Diane G. Lucas*
         Assistant United States Attorney
         United States Attorney's Office
         District of Columbia
         601 D Street NW
         Washington, DC 20350
         202-252-7724
         Diane.Lucas@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

On this 14th day of September 2022, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

*/s/ Diane G. Lucas*
Assistant United States Attorney
United States Attorney's Office
District of Columbia
601 D Street NW
Washington, DC 20350
202-252-7724
Diane.Lucas@usdoj.gov
